UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. HAMZA B. ALKHOLI and AHMED HALAWANI, <br><br> *Plaintiffs,* <br><br> v. <br><br> HARRY B. MACKLOWE AND MACKLOWE INVESTMENT PROPERTIES, LLC, <br><br> *Defendants.* | Civil Action No. <br><br> **COMPLAINT** <br><br> Jury Trial Demanded |

Plaintiffs Dr. Hamza B. Alkholi ("Alkholi") and Ahmed Halawani ("Halawani," and, together with Alkholi, "Plaintiffs"), by and through their attorneys, Akerman LLP, hereby file their complaint against Defendants Harry B. Macklowe ("Macklowe") and Macklowe Investment Properties, LLC ("Macklowe Properties," and together with Macklowe, the "Defendants"), and allege, on knowledge as to themselves and their conduct and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract, unjust enrichment, and *quantum meruit* in violation of the laws of the State of New York.

2.      Plaintiffs and Defendants were negotiating a joint venture (the "Joint Venture") to acquire and develop the retail component of a property located at 432 Park Avenue, New York, New York 10022 (the "Property").

3.      To achieve its aims, the proposed Joint Venture required capital in an amount of approximately $450,000,000.

4.      With negotiations regarding the Joint Venture ongoing, Plaintiffs and Defendants entered into an independent agreement by which Plaintiffs raised the capital necessary to acquire the Property.

5.      Under the terms of the Parties' capital raise agreement (the "Capital Raise Agreement"), in return for Plaintiffs securing the capital necessary to complete the project, Defendants would make a payment equal to 2.0% of the capital raised.

6.      Separately, the Parties continued to negotiate the terms of the Joint Venture, which would have granted Plaintiffs a carried interest position in the Joint Venture entity.

7.      Plaintiffs expended considerable time, effort, and funds promoting the Joint Venture and soliciting investors pursuant to the Capital Raise Agreement.

8.      Pursuant to their agreement, Plaintiffs provided Defendants access to Plaintiffs' valuable network of wealthy and influential contacts, and ultimately succeeded in securing an investor to provide 100% percent of the required financing.

9.      However, after Plaintiffs raised the capital necessary to acquire the Property, Defendants excluded Plaintiffs from the transaction.

10.      Furthermore, Defendants, in violation of the Capital Raise Agreement, refused to pay Plaintiffs their fee.

11.      Plaintiffs, therefore, now commence this action against Defendants to recover the amounts owed under the Parties' Capital Raise Agreement.

## PARTIES

12.      Plaintiff Dr. Hamza B. Alkholi is an individual who resides in Saudi Arabia.

13.      Plaintiff Ahmed Halawani is an individual who resides in Saudi Arabia.

- 2 -

14.     Upon information and belief, Defendant Macklowe is an individual who resides in the State of New York.

15.     Upon information and belief, Defendant Macklowe Properties is a domestic limited liability company organized under the laws of the State of New York, with its principal place of business located at 767 Fifth Avenue, 21st Floor, New York, New York 10153.

16.     Upon information and belief, Defendant Macklowe is the founder, officer, majority interest holder, and principal of Defendant Macklowe Properties.

17.     Upon information and belief, Defendant Macklowe exercised complete control over Macklowe Properties' actions with respect to the Joint Venture, the Capital Raise Agreement, and the Property.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because the Parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because it is the domicile of the Defendants and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## FACTS UNDERLYING PLAINTIFFS' CLAIMS

### A.     The Joint Venture

20.     In November 2013, the Parties began negotiating the terms of a Joint Venture to acquire the retail component of the Property, 432 Park Avenue.

21.     The Property was then-owned by CIM Group.

22.     The projected capital needs of the Joint Venture to acquire the Property were approximately $450,000,000.

- 3 -

23.     Under the proposed terms of the Joint Venture, Plaintiffs would be the "Non-Managing Member" in the "Upper-Tier" entity that would serve as the "managing member" of a "Lower-Tier" entity that would in turn indirectly acquire the Property through a wholly-owned subsidiary.

24.     As a "Non-Managing Member" of the "Upper-Tier" management entity, Plaintiffs would receive a carried interest position in the economic benefits reaped from the Property's acquisition and operation.

**B.      The Parties' Capital Raise Agreement**

25.     Separately, with negotiations regarding the final terms and structure of the Joint Venture ongoing, the parties entered into an independent agreement regarding raising the funds necessary to acquire the Property.

26.     Initially, Macklowe offered Plaintiff 1.5% of a wholly successful capital raise.

27.     Plaintiffs made a counterproposal of 2.0%, which Macklowe expressly agreed to by e-mail dated November 6, 2013.

28.     In this e-mail, which bore Macklowe's electronic signature, Macklowe stated that a 2.0% fee "will work" and authorized the Plaintiffs to begin seeking potential investors.

29.     Plaintiffs commenced performing their end of the bargain in November 2013 by identifying, contacting and providing information to prospective investors.

30.     After Plaintiffs commenced their work, Defendants subsequently affirmed the existence of the Capital Raise Agreement.

31.     On December 11, 2013, Bruce Kimmelman ("Kimmelman"), an employee of Defendants, wrote to Plaintiffs regarding ongoing negotiations over the "deal structure" of the Joint Venture.

32.     In that e-mail, Kimmelman "[a]lso" wrote separately to confirm the parties' understanding regarding what he referred to as "the compensation agreement for the capital raise."

33.     In that e-mail, on behalf of Defendants, Kimmelman wrote "as we agreed to … our agreement was to pay 2% for the equity raised."

34.     At no time did Defendant state that any further writing was necessary to memorialize the Parties' agreement with respect to the Capital Raise Agreement.

**C.     Plaintiffs' Services On Behalf of Defendants**

35.     Plaintiffs possessed valuable contacts among wealthy and influential individuals, including foreign nobility and dignitaries, a valuable potential investor base to which Defendants would not otherwise have had access.

36.     Plaintiffs contacted potential investors, providing them information regarding the potential transaction in the Property.

37.     Alkholi further recommended the transaction's merits by assuring prospective investors that he too would be participating as a co-investor through the Joint Venture.

38.     Furthermore, Plaintiffs arranged for Kimmelman to speak to and meet with potential investors in Qatar and Abu Dhabi.

39.     Throughout the process, Defendants were aware of the work Plaintiffs performed pursuant to the Capital Raise Agreement, and recognized the benefits their work provided.

40.     For example, on December 20, 2013, Kimmelman wrote to Plaintiffs, copying Macklowe, to say "Thanks for your efforts here.  Spoke with Harry [Macklowe] he is glad you are on board and appreciates your efforts in pulling this together."

**D.    Negotiations Of The Joint Venture Also Referenced The Capital Raise Agreement**

41.    After the Parties agreed to the Capital Raise Agreement, and Plaintiffs began performing pursuant to it, the Parties continued to negotiate the structure of the Joint Venture.

42.    Significantly, draft documents prepared for the Joint Venture circulated between the Parties referenced the Capital Raise Agreement.

43.    On December 28, 2013, the law firm of Paul Hastings LLP, on behalf of Defendants, circulated draft Letters of Intent ("LOI") to Plaintiffs, setting forth additional terms and conditions of the Joint Venture for both Upper-Tier and Lower-Tier entities.

44.    The draft LOI for the Lower-Tier entity specifically referenced and incorporated the Parties' the Capital Raise Agreement, stating:

> In consideration for [Plaintiffs'] procurement of the Investor Member, GP Investor will be entitled to receive a placement agent fee ("Placement Fee") equal to two percent (2%) of the Initial Required Capital of the Investor Member.  In lieu of payment of the Placement Fee by the Joint Venture to the GP Investor, GP Investor may receive membership interests in the Joint Venture together with a capital account in an amount equal to the Placement Fee.

45.    However, Plaintiffs did not execute the LOI, leaving the Capital Raise Agreement as agreed to between the Parties in November of 2013 in full force and effect.

**E.    Defendants' Exclusion Of Plaintiffs From The Property Transaction**

46.    Among the potential investors Plaintiffs contacted was QInvest, a financial services firm headquartered in Qatar.

47.    Craig Cowie ("Cowie"), on information and belief the head of QInvest's Real Estate Investment & Advisory business, represented QInvest in relation to the potential transaction.

- 6 -

48.    In or around January of 2014, discussions took place concerning QInvest's potential participation in the investment.

49.    The parties met on or around January 15, 2014 to discuss the transaction, and QInvest subsequently retained the law firm of Latham & Watkins LLP to represent them.

50.    During the negotiations, Defendant provided QInvest with models regarding the investment which reflected the compensation owed to Plaintiffs under Defendants Capital Raise Agreement with Plaintiffs.

51.    However, Defendants and QInvest soon moved to exclude Plaintiffs from the negotiation process, negotiating a new LOI without Plaintiffs' input or approval, one that would have reduced Plaintiffs' compensation to a mere .5% in violation of Defendants' Capital Raise Agreement.

52.    In February of 2014, Defendants executed the new LOI with QInvest, notwithstanding Defendants' prior Capital Raise Agreement with Plaintiffs.

53.    Neither of the Plaintiffs were parties to the LOI and Kimmelman, on behalf of Defendants, assured them the document was "non binding."

54.    Following execution of the LOI, QInvest took further action to exclude Plaintiff from the transaction, demanding it be Defendants' only partner in the Joint Venture and the investment in the Property.  Once again, Defendants acquiesced to QInvest's demands at Plaintiffs' expense.

55.    In March of 2014, Kimmelman informed Plaintiffs that Defendants and QInvest were moving ahead with CIM Group, the seller of the Property, to complete the purchase of the Property, seeming to have forgotten the Capital Raise Agreement entirely and to have forgotten all prior negotiations with Plaintiffs with respect to the Joint Venture.

**F.    Defendants' Continuing Failure To Abide By The Parties' Agreement**

56.    On or around June of 2014, Halawani met with Kimmelman regarding the changes to the investment structure that had excluded Plaintiffs from the Joint Venture, and in subsequent communications requested Defendants resolve the outstanding issue of the compensation due to Plaintiffs.

57.    Halawani noted that the initial Capital Raise Agreement was "initially agreed between Dr. Al Khouli and Harry [Macklowe]" and that Defendants' obligation to pay the fee was "uncontested and must be honored."

58.    Macklowe, however, disclaimed responsibility for paying the agreed upon compensation in a June 15, 2014 e-mail, claiming that the fee was to have been the responsibility of the investor, QInvest.

59.    In response, Halawani reminded Macklowe that under the Parties' Capital Raise Agreement, Plaintiffs "[were] to be paid 2 pct placement fee from you directly as part of the transaction cost."

60.    Halawani further noted that the exclusion of Plaintiffs by QInvest from any co-invest opportunity in the Joint Venture was a separate issue, and that Halawani would negotiate a resolution of that point separately with QInvest.  Macklowe did not respond.

61.    In and around July 2014, media outlets published news that Defendants and an "unidentified foreign equity partner," upon information and belief, QInvest, had purchased the Property.

62.    Additionally, in and around July of 2014, Macklowe contacted Alkholi, but not with respect to the compensation owed to Plaintiffs; rather, Macklowe contacted Alkholi regarding the prospect of Alkholi purchasing a residential unit in the Property.

63.    In reply, noting a desire to preserve the parties' friendship and business relationship, Alkholi reminded Macklowe of the compensation due and owing to him and Halawani under the Capital Raise Agreement for securing the "450 mio that benefitted yourself directly and the rest of the [partners] on the project." Alkholi also noted Halawani's attempts to resolve the issue and Macklowe's lack of a response.

64.    Also in and around July 2014, Halawani attempted to contact Macklowe again in the hopes of resolving the issue in order to maintain the Parties' "mutually beneficial relationship," but noted a lack of "any positive reaction" from Macklowe.

65.    In July of 2014, Macklowe responded to Alkholi, promising to speak on the matter. However, Macklowe took no meaningful action, and Plaintiffs were forced to continue to press the issue well into the fall and winter of 2014.

66.    In or around October of 2014, Halawani wrote to Macklowe "to see when are you planning to settle the 2 pct. placement fee outstanding issue." Macklowe promised to contact Alkholi regarding the matter.

67.    However, Macklowe again declined to honor the Capital Raise Agreement.

68.    In or around November 2014, Alkholi wrote to Macklowe, reminding him of his promise to come forward with a "proposal to settle the Placement fees" and noting Plaintiffs had not received anything to date.

69.    Macklowe replied that he was "[w]orking thinking about this as requested," but took no meaningful action to resolve the issue.

70.    In or around December 2014, Alkholi again wrote to Macklowe, repeating his request for a proposal to resolve the issue, expressing a "[h]ope to close this matter [b]efore year end." Once again, Macklowe failed to respond.

**G.    Plaintiffs Reach An Accommodation With QInvest**

71.    During the fall of 2014, while Plaintiffs pressed Defendants to live up to their obligations under the Capital Raise Agreement, Plaintiffs separately negotiated with QInvest to resolve the separate issue of Plaintiffs' exclusion from the Joint Venture.

72.    On or around November 2014, Plaintiffs negotiated a Letter Agreement (the "Letter Agreement") with 432 Park Holdings, S.A. ("432 Park Holdings") that was ultimately executed on December 23, 2014.

73.    Upon information and belief, 432 Park Holdings is a corporate entity organized under the laws of Luxembourg established by QInvest to participate in the Property transaction: Sheikh Jassim bin Hamad bin Jassim bin Jaber Al-Thani, Chairman of QInvest, signed on behalf of 432 Park Holdings.

74.    The stated purpose of the Letter Agreement was to resolve "any claims against [432 Park Holdings] (and our owners or affiliates) that you may have in respect of any breach of any prior agreement to form a Joint Venture."

75.    The Letter Agreement provided that a settlement payment pursuant to its terms would be in satisfaction of "[432 Park Holding's] obligations to [Plaintiffs]," and would "release and discharge [432 Park Holdings]" from claims relating to the Property.

76.    Neither of Macklowe Properties nor Macklowe was a party to the Letter Agreement.

77.    The Letter Agreement did not release, and Plaintiffs did not intend to release, any claims against Macklowe Properties or Macklowe.

78.     To the contrary, the Letter Agreement expressly carved any claims against "Mr. Harry Macklowe" from its release provisions, and therefore Plaintiffs continued to press Macklowe to honor the obligation of the Capital Raise Agreement.

**H.     Plaintiffs' Are Forced To Seek Judicial Intervention**

79.     However, Defendants have continued to refuse to pay the compensation due and owing under the Capital Raise Agreement, resulting in Alkholi filing an action in the Supreme Court of the State of New York styled *Dr. Hamza B. Alkholi v. Macklowe Investment Properties, LLC*, Index. No. 652584/2015 (the "State Action").

80.     The parties agreed to voluntary mediation before the Honorable Stephen G. Crane (Ret.) on January 14, 2016, but were unable to resolve the matter.   The State Action was voluntarily discontinued without prejudice on December 22, 2016.

81.     Defendants to date have made no efforts to comply with the Capital Raise Agreement, necessitating the instant suit.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Breach of Written Contract Against Defendant Macklowe)**

82.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 81 as if fully set forth herein.

83.     As set forth above and incorporated herein, Macklowe is an officer and/or the principal of Macklowe Properties.

84.     As set forth above and incorporated herein, Kimmelman acted as Macklowe's agent and on his behalf in negotiations and communications with Plaintiffs.

85.     Upon information and belief, at all relevant times, Macklowe exercised complete and total control of the operations of Macklowe Properties with respect to the Property, the Joint Venture, and the Capital Raise Agreement.

86.     As set forth and incorporated herein, in or around November 2013, Macklowe personally negotiated with Plaintiffs to form the Joint Venture to acquire and develop the Property.

87.     Separately, Macklowe negotiated with Plaintiffs to secure the necessary financing to acquire the Property, offering in consideration a payment equal to a percentage of the funds raised.

88.     Macklowe ultimately agreed that Plaintiffs would receive compensation equal to 2.0% of a wholly successful capital raise.

89.     Thus, Plaintiffs and Macklowe entered into a stand-alone Capital Raise Agreement by which Plaintiffs were to receive a set payment in return for providing specifically delineated services, namely securing the capital necessary to acquire the Property.

90.     Plaintiffs, Macklowe, and Macklowe's agent, Kimmelman, clearly expressed and memorialized the terms of the Capital Raise Agreement via signed e-mails.

91.     The Capital Raise Agreement is therefore a binding written contract entered into between Plaintiffs on the one hand and Defendant Macklowe on the other hand.

92.     To the extent Macklowe purported to act on behalf of Macklowe Properties with respect to the Capital Raise Agreement, Macklowe Properties was a mere instrumentality of Macklowe due to the complete and total control Macklowe exercised over Macklowe Properties with respect to the transactions described herein.

93.     Furthermore, Macklowe abused Macklowe Properties' corporate form by using it to secure a benefit to himself, in the form of Plaintiffs' efforts on his behalf and subsequent successful capital raise, while using it to avoid any obligation to Plaintiffs to compensate them for that benefit.

- 12 -

94.     Accordingly, Macklowe Properties was merely the alter ego of Macklowe, and Macklowe is personally liable under the Capital Raise Agreement.

95.     As set forth and incorporated herein, based on the Capital Raise Agreement, Plaintiffs worked to secure financing for the Property's acquisition, contacting investors, extolling its merits, and arranging meetings, expending considerable time, effort and funds in the process.

96.     Thanks to the efforts of Plaintiffs, QInvest agreed to invest, and upon information and belief ultimately did invest, the entire $450,000,000 necessary to acquire the Property.

97.     Upon information and belief, Defendant and QInvest closed the acquisition of the Property in July of 2014, a transaction that would not have occurred without Plaintiffs' endeavors.

98.     However, Macklowe allowed QInvest to exclude Plaintiffs from the Joint Venture and, crucially, failed to pay Plaintiffs the compensation owed under the independent Capital Raise Agreement.

99.     Despite repeated due demands, no part of the agreed upon compensation has been paid to Plaintiffs by Macklowe; as a result, Macklowe is in breach and default of his contractual obligations to Plaintiffs.

100.    As a direct and proximate result of the foregoing breaches of contract by Macklowe, Plaintiffs have suffered damages in an amount no less than $9,000,000.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Written Contract Against Defendant Macklowe Properties)

101.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 100 as if fully set forth herein.

102.   As set forth above and incorporated herein, Macklowe is an officer and/or the principal of Macklowe Properties.

103.   As set forth above and incorporated herein, Kimmelman is an officer and/or employee of Macklowe Properties.

104.   As set forth above and incorporated herein, Macklowe and Kimmelman acted as Macklowe Properties' authorized agents and representatives with respect to transactions described herein.

105.   Macklowe and Kimmelman, on behalf of Macklowe Properties, engaged Plaintiffs to secure the necessary financing to acquire the Property, offering in consideration a payment equal to a percentage of the funds raised.

106.   Through Macklowe and Kimmelman, Macklowe Properties ultimately agreed that Plaintiffs would receive compensation equal to 2.0% of a wholly successful capital raise.

107.   Thus, Plaintiffs and Macklowe Properties entered into the stand-alone Capital Raise Agreement by which Plaintiffs were to receive a set payment in return for providing specifically delineated services, namely securing the capital necessary to acquire the Property.

108.   Plaintiffs, Macklowe and Kimmelman clearly expressed and memorialized the terms of the Capital Raise Agreement via signed e-mails.

109.   Through these e-mails, Macklowe and Kimmelman bound Macklowe Properties to a written bargain under which Plaintiffs would receive, in return for securing the necessary capital, a fee equal to 2.0% of the capital raised.

110.   Macklowe and Kimmelman were acting within the scope of their authority as Macklowe Properties' agents in entering into the Capital Raise Agreement.

111.    The Capital Raise Agreement is therefore a binding written contract entered into between Plaintiff on the one hand and Defendant Macklowe Properties on the other hand.

112.    Thanks to the efforts of Plaintiffs, QInvest agreed to invest, and upon information and belief ultimately did invest, the entire $450,000,000 necessary to acquire the Property.

113.    Upon information and belief, Defendant and QInvest closed the acquisition of the Property in July of 2014, a transaction that would not have occurred without Plaintiffs' endeavors.

114.    However, Macklowe Properties allowed QInvest to exclude Plaintiffs from the Joint Venture and failed to pay Plaintiffs the compensation owed under the Capital Raise Agreement.

115.    Despite repeated due demands, no part of the agreed upon compensation has been paid to Plaintiffs by Macklowe Properties; as a result, Macklowe Properties is in breach and default of its contractual obligations to Plaintiffs.

116.    As a direct and proximate result of the foregoing breaches of contract by Macklowe Properties, Plaintiffs have suffered damages in an amount no less than $9,000,000.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Oral Contract Against Defendant Macklowe)

117.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 116 as if fully set forth herein.

118.    As set forth above and incorporated herein, Macklowe is an officer and/or the principal of Macklowe Properties.

119.    As set forth above and incorporated herein, Kimmelman acted as Macklowe's agent and on his behalf in negotiations and communications with Plaintiffs.

120.    Upon information and belief, at all relevant times, Macklowe exercised complete and total control of the operations of Macklowe Properties with respect to the Property, the Joint Venture, and the Capital Raise Agreement.

121.    As set forth above and incorporated herein, in or around November 2013, Macklowe negotiated with Plaintiffs to form a Joint Venture to acquire and develop the property, and separately entered into a Capital Raise Agreement to secure the necessary financing.

122.    Plaintiffs, Macklowe, and Macklowe's agents documented the terms of the Capital Raise Agreement by a series of e-mails in November and December of 2013.

123.    These e-mails set forth a binding written contract between Plaintiffs and Macklowe.

124.    In the alternative, the e-mails evidence a binding oral contract between them.

125.    In these e-mails, Macklowe and his agent Kimmelman acknowledged that Plaintiffs would receive a payment equal to two percent of the capital raised, in return for their efforts to secure the necessary financing.

126.    At no time did Macklowe or his agent express an intent not to be bound by the Capital Raise Agreement absent entry into an additional formalized writing.

127.    Indeed, Macklowe expressly authorized Plaintiffs to begin contacting investors pursuant to the Capital Raise Agreement, and was aware of, and expressed gratitude for, Plaintiffs efforts to solicit then necessary funds.

128.    As set forth above at paragraphs 85 and 92-94, and incorporated herein, to the extent Macklowe purported to act on behalf of Macklowe Properties, Macklowe Properties was a mere instrumentality – and is therefore the alter ego – of Macklowe and Macklowe is personally liable under the Capital Raise Agreement.

- 16 -

129.    As set forth above at paragraphs 35-40, 46-48, 96-97, and 112-113, and incorporated herein, pursuant to the Capital Raise Agreement Plaintiffs performed their obligations and secured 100% of the financing necessary to close on the Property.

130.    However, as set forth above at paragraphs 51-70, 79-81, 98-100, and 114-115, and incorporated herein, Macklowe wholly failed to uphold his end of the bargain, despite repeated requests by Plaintiffs.

131.    As a direct and proximate result of the foregoing breaches of contract by Defendant Macklowe, Plaintiffs have suffered damages in an amount no less than $9,000,000.

### AS AND FOR A FOURTH CAUSE OF ACTION
<u>(Breach of Oral Contract Against Defendant Macklowe Properties)</u>

132.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 131 as if fully set forth herein.

133.    As set forth above and incorporated herein, Macklowe is an officer and/or the principal of Macklowe Properties.

134.    As set forth above and incorporated herein, Kimmelman is an officer and/or employee of Macklowe Properties.

135.    As set forth above and incorporated herein, Macklowe and Kimmelman acted as Macklowe Properties' authorized agents and representatives with respect to transactions described herein.

136.    Macklowe and Kimmelman, on behalf of Macklowe Properties, engaged Plaintiffs to secure the necessary financing to acquire the Property, offering in consideration a payment equal to a percentage of the funds raised.

137.    Through Macklowe, Macklowe Properties ultimately agreed that Plaintiffs would receive compensation equal to 2.0% of a wholly successful capital raise.

138.    Thus, Plaintiffs and Macklowe Properties entered into the stand-alone Capital Raise Agreement by which Plaintiffs were to receive a set payment in return for providing specifically delineated services, namely securing the capital necessary to acquire the Property.

139.    Plaintiffs and Macklowe Properties, through its agents Macklowe and Kimmelman, clearly expressed and memorialized the terms of the Capital Raise Agreement via signed e-mails.

140.    These e-mails set forth a binding written contract between Plaintiffs and Macklowe Properties.

141.    In the alternative, the e-mails evidence the binding oral contract between them.

142.    At no time did Macklowe Properties through its agents express an intent not to be bound by the Capital Raise Agreement absent entry into an additional formal writing.

143.    Indeed, Macklowe expressly authorized Plaintiffs to begin contacting investors pursuant to the Capital Raise Agreement and was fully aware of, and expressed gratitude for, Plaintiffs efforts to solicit then necessary funds.

144.    As set forth above at paragraphs 85 and 92-94, and incorporated herein, to the extent Macklowe purported to act on behalf of Macklowe Properties, Macklowe Properties was a mere instrumentality – and is therefore the alter ego – of Macklowe and Macklowe is personally liable under the Capital Raise Agreement.

145.    As set forth above at paragraphs 35-40, 46-48, 96-97, and 112-113, and incorporated herein, pursuant to the Capital Raise Agreement Plaintiffs performed their obligations and secured 100% of the financing necessary to advance the joint venture.

- 18 -

146.     However, as set forth above at paragraphs 51-70, 79-81, 98-100, and 114-115, and incorporated herein, Macklowe wholly failed to uphold his end of the bargain, despite repeated requests by Plaintiffs.

147.     As a direct and proximate result of the foregoing breaches of contract by Defendant Macklowe Properties, Plaintiffs have suffered damages in an amount no less than $9,000,000.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Unjust Enrichment Against Defendant Macklowe)**

148.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 147 as if fully set forth herein.

149.     In the alternative, in the event the Court does not find a contract existed between the parties, Macklowe has been unjustly enriched by his wrongful refusal to pay Plaintiffs compensation for Plaintiffs' services.

150.     As set forth above and incorporated herein, Macklowe only secured the capital necessary to acquire the Property through Plaintiffs' efforts.  Plaintiffs provided indispensable services to Macklowe including, *inter alia*, soliciting potential investors, making their valuable network of contacts available to Defendants, and arranging meetings – expending time, effort and expenses in the process.  Alkholi further staked his own reputation on the transaction, touting its merits by assuring potential investors that he would be a co-investor in the project.

151.     Macklowe recognized and accepted Plaintiffs efforts on his behalf, thanking Plaintiffs for their work on repeated occasions.

152.     Through Plaintiffs' efforts Macklowe obtained the capital necessary to acquire the Property, an amount of approximately $450,000,000 that benefited Macklowe directly.

153.    As set forth above at paragraphs 85 and 92-94, and incorporated herein, to the extent Macklowe purported to act on behalf of Macklowe Properties, Macklowe Properties was a mere instrumentality – and is therefore the alter ego – of Macklowe, and Macklowe personally profited from the capital and the acquisition of the Property.

154.    Macklowe's acquisition and current ownership interests in the Property are the direct and proximate result of Plaintiffs' efforts. As a result, it would unjustly enrich Macklowe, and offend fundamental principles of equity, justice and good conscience, to permit Macklowe to retain the benefits of Plaintiffs' efforts without providing Plaintiffs any compensation in return.

155.    Plaintiffs are therefore entitled to a judgment directing Macklowe to disgorge such unjust enrichment in an amount to be determined at trial in this action, but no less than $9,000,000.

156.    Furthermore, Plaintiffs and Macklowe, by virtue of their long-standing business relationship and negotiations to engage in the Joint Venture to acquire and develop the Property, possessed a close relationship upon which Plaintiffs relied and which induced Plaintiffs to act on behalf of Macklowe and the Joint Venture to secure investors in the project.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment Against Defendant Macklowe Properties)

157.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 156 as if fully set forth herein.

158.    In the alternative, in the event the Court does not find a contract existed between the parties, Macklowe Properties has been unjustly enriched by its wrongful refusal to pay Plaintiffs compensation for Plaintiffs' services.

159.    As set forth above and incorporated herein, Macklowe Properties only secured the capital necessary to acquire the Property through Plaintiffs' efforts. Plaintiffs provided

indispensable services to Macklowe Properties including, *inter alia*, soliciting potential investors, making their valuable network of contacts available to Defendants, and arranging meetings – expending time, effort and expenses in the process. Alkholi further staked his own reputation on the transaction, touting its merits by assuring potential investors that he would be a co-investor in the project.

160.    Macklowe Properties recognized and accepted Plaintiffs efforts through the actions of its agents, Macklowe and Kimmelman, who authorized and acknowledged Plaintiffs work on repeated occasions.

161.    Through Plaintiffs' efforts Macklowe Properties obtained the capital necessary to acquire the Property, in an amount of approximately $450,000,000 that benefited Macklowe Properties directly.

162.    Macklowe Properties' acquisition and current ownership interests in the Property are the direct and proximate results of Plaintiffs' efforts.  As a result, it would unjustly enrich Macklowe Properties, and offend fundamental principles of equity, justice and good conscience, to permit Macklowe Properties to retain the benefits of Plaintiffs' efforts without providing Plaintiffs any compensation in return.

163.    Plaintiffs are therefore entitled to a judgment directing Macklowe Properties to disgorge such unjust enrichment in an amount to be determined at trial in this action, but no less than $9,000,000.

164.    Furthermore, Plaintiffs and Macklowe Properties, by virtue of their long-standing business relationship and negotiations to engage in the Joint Venture to acquire and develop the Property, possessed a close relationship upon which Plaintiffs relied and which induced Plaintiffs

to act on behalf of Macklowe Properties and the proposed Joint Venture to secure investors in the project.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (*Quantum Meruit Against Defendant Macklowe*)

165.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 164 as if fully set forth herein.

166.    As set forth above at paragraphs 35-40, 46-48, 96-97, 112-113, and incorporated herein, Plaintiffs performed valuable services on behalf of Macklowe and the proposed Joint Venture.

167.    Plaintiffs performed these services in good faith based upon Macklowe's promise to pay Plaintiffs fair and reasonable compensation for services rendered equal to 2.0% of the total capital raised through Plaintiffs' efforts.

168.    Plaintiffs performed their services in the expectation that they would be fairly and reasonably compensated pursuant to Macklowe's promise.

169.    The fair and reasonable value of Plaintiffs' services, per Macklowe's specific agreement, is $9,000,000.

170.    No part of the aforementioned sum has been paid to Plaintiffs.

171.    Macklowe received, and continues to enjoy, substantial economic benefits as a result of Plaintiffs' efforts, including those benefits stemming from the successful acquisition of the Property.

172.    As set forth above at paragraphs 85 and 92-94, and incorporated herein, to the extent Macklowe purported to act on behalf of Macklowe Properties, Macklowe Properties was a mere instrumentality – and is therefore the alter ego – of Macklowe, and Macklowe personally profited from the capital that purportedly flowed to Macklowe Properties.

173.    It is inequitable and unjust for Macklowe to have obtained such benefits without justly compensating Plaintiffs.

174.    Plaintiffs have suffered and will continue to suffer injury and damages in an amount to be determined a trial, but no less than $9,000,000 as a direct and proximate result of Macklowe's actions.

175.    Furthermore, Plaintiff and Macklowe, by virtue of their long-standing business relationship and negotiations to engage in a joint venture to acquire and develop the Property, possessed a close relationship upon which Plaintiffs relied and which induced Plaintiffs to act on behalf of Macklowe and the proposed Joint Venture to secure investors in the project.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (*Quantum Meruit Against Defendant Macklowe Properties*)

176.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 175 as if fully set forth herein.

177.    As set forth above at paragraphs 35-40, 46-48, 96-97, 112-113, and incorporated herein, Plaintiffs performed valuable services on behalf of Macklowe Properties and the proposed Joint Venture.

178.    Plaintiffs performed these services in good faith based upon Macklowe Properties' promise, given through its agents Macklowe and Kimmelman, to pay Plaintiffs fair and reasonable compensation for services rendered equal to 2.0% of the total capital raised through Plaintiffs' efforts.

179.    Plaintiffs performed their services in the expectation that they would be fairly and reasonably compensated pursuant to Macklowe Properties' promise.

180.    The fair and reasonable value of Plaintiffs' services, per Macklowe Properties' specific agreement, is $9,000,000.

- 23 -

181.    No part of the aforementioned sum has been paid to Plaintiffs.

182.    Macklowe Properties received, and continues to enjoy, substantial economic benefits as a result of Plaintiffs' efforts, including those benefits stemming from the successful acquisition of the Property.

183.    It is inequitable and unjust for Macklowe Properties to have obtained such benefits without justly compensating Plaintiffs.

184.    Plaintiffs have suffered and will continue to suffer injury and damages in an amount to be determined a trial, but no less than $9,000,000 as a direct and proximate result of Macklowe Properties' actions.

185.    Furthermore, Plaintiff and Macklowe Properties, by virtue of their long-standing business relationship and negotiations to engage in a joint venture to acquire and develop the Property, possessed a close relationship upon which Plaintiffs relied and which induced Plaintiffs to act on behalf of Macklowe Properties and the proposed Joint Venture to secure investors in the project.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment against Defendants:

i)      On the First Cause of Action for Breach of Written Contract, awarding Plaintiffs compensatory damages against Defendant Macklowe in an amount to be determined at trial, but in no event less than $9,000,000, with such amount to include Plaintiffs' direct and consequential damages as a result of the conduct set forth herein;

ii)     On the Second Cause of Action for Breach of Written Contract, awarding Plaintiffs compensatory damages against Defendant Macklowe Properties in an amount to be determined at trial, but in no event less than $9,000,000, with such amount to include Plaintiffs' direct and consequential damages as a result of the conduct set forth herein;

iii)  On the Third Cause of Action for Breach of Oral Contract, awarding Plaintiffs compensatory damages against Defendant Macklowe in an amount to be determined at trial, but in no event less than $9,000,000, with such amount to include Plaintiffs' direct and consequential damages as a result of the conduct set forth herein;

iv)  On the Fourth Cause of Action for Breach of Oral Contract, awarding Plaintiffs compensatory damages against Defendant Macklowe Properties in an amount to be determined at trial, but in no event less than $9,000,000, with such amount to include Plaintiffs' direct and consequential damages as a result of the conduct set forth herein;

v)  On the Fifth Cause of Action for Unjust Enrichment, awarding Plaintiffs compensatory damages against Defendant Macklowe in an amount to be determined at trial, but in no event less than $9,000,000;

vi)  On the Sixth Cause of Action for Unjust Enrichment, awarding Plaintiffs compensatory damages against Defendant Macklowe Properties in an amount to be determined at trial, but in no event less than $9,000,000;

vii)  On the Seventh Cause of Action for *Quantum Meruit*, awarding Plaintiffs compensatory damages against Defendant Macklowe in an amount to be determined at trial, but in no event less than $9,000,000;

viii)  On the Eighth Cause of Action for *Quantum Meruit*, awarding Plaintiffs compensatory damages against Defendant Macklowe Properties in an amount to be determined at trial, but in no event less than $9,000,000;

ix)  Awarding Plaintiffs pre-judgment and post-judgment interest on all damages awarded;

x)  Awarding Plaintiffs reasonable attorneys' fees, experts' fees and expenses;

xi)  Awarding Plaintiffs all costs of court; and

xii)  Awarding Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: New York, New York
December 23, 2016

Respectfully submitted,

**AKERMAN LLP**

*/s/ Donald N. David*
Donald N. David
donald.david@akerman.com
M. Darren Traub
darren.traub@akerman.com
666 Fifth Avenue, 20th Floor
New York, New York 10103
Telephone: 212.880.3800
Facsimile: 212.880.8965

*Attorneys for Plaintiffs Dr.
Hamza B. Alkholi and
Ahmed Halawani*