UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
HAMZA B. ALKHOLI and AHMED HALAWANI,

                         Plaintiffs,

                                        17 Civ. 16 (DAB)
                                        **MEMORANDUM & ORDER**

          v.

HARRY B. MACKLOWE and MACKLOWE INVESTMENT
PROPERTIES, LLC,

                         Defendants.
---------------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     On January 3, 2017, Plaintiffs Hamza B. Alkholi and Ahmed

Halawani filed suit against Defendants Harry B. Macklowe and

Macklowe Investment Properties, LLC ("MIP") for breach of

written contract, breach of oral contract, unjust enrichment,

and quantum meruit, all in connection with a purported joint

venture related to the development of 432 Park Avenue, New York,

New York 10022 (the "Property"). On March 7, 2017, Defendants

moved to dismiss Plaintiffs' claims, which Plaintiffs opposed.

For the following reasons, the Court GRANTS IN PART and DENIES

IN PART Defendants' Motion to Dismiss.


I.   BACKGROUND

     Defendants are both residents of Saudi Arabia. (Compl. ¶¶

12-13.) Macklowe is the founder, officer, majority interest

holder, and principal of MIP, a New York-based real estate

development firm. (<u>Id.</u> ¶¶ 14-16.) In November 2013, the parties began negotiating a joint venture to acquire the retail component of the Property. (<u>Id.</u> ¶ 20.) The projected capital needs of the project were approximately $450,000,000. (<u>Id.</u> ¶ 22.) Plaintiffs were to provide Defendants access to their network of wealthy contacts to secure funding for the project. (<u>Id.</u> ¶ 8.)

In exchange for the introductions, Plaintiffs allegedly were to receive a carried interest position in the economic benefits reaped from the Property's acquisition and operation. (<u>Id.</u> ¶ 24.) On November 6, 2013, in response to Plaintiffs' proposal that they receive 2.0% of a wholly successful capital raise, Macklowe responded via email: "Glad you are interested in the deal. I think a 2% fee will work." (<u>Id.</u> ¶¶ 27-28; Decl. of David Feuerstein in Supp. of Defs.' Mot. Dismiss ("Feuerstein Decl."), Ex. C at 2-3.) The email bore Macklowe's electronic signature: his name followed by "Macklowe Properties." (Compl. ¶ 28; Feuerstein Decl., Ex. C at 3.) Plaintiffs contend that this email created a contract and refer to it as the "Capital Raise Agreement." (<u>See, e.g.</u>, <u>id.</u> ¶ 34.) Thereafter, Plaintiffs allegedly commenced work by identifying, contacting, and providing information to potential investors. (Compl. ¶ 29.)

On December 11, 2013, MIP employee Bruce Kimmelman emailed Alkholi regarding ongoing negotiations of the deal structure of

the joint venture. (Id. ¶ 31; Feuerstein Decl., Ex. D.)
Kimmelman's email stated in part, "We never finalized the deal
structure when you were in New York," and attached a draft joint
venture term sheet. (Feuerstein Decl., Ex. D.) Kimmelman further
wrote:

> [W]e need to finalize the compensation agreement for the
> capital raise. . . . [O]ur agreement was to pay 2% of
> the equity raised. There were some conversations with
> Mr. Halawani that he also wanted 40% of the GP as
> compensation and 20% additional for QInvest if they
> raised money. That is a change to the structure that we
> discussed and we need to finalize.

(Id.)

Defendants allegedly recognized the benefits of Plaintiffs'
work as 2013 progressed. (Compl. ¶ 39.) For example, on December
20, 2013, Kimmelman allegedly emailed Plaintiffs, copying
Macklowe, saying, "Thanks for your efforts here. . . .
[Macklowe] . . . is glad you are on board and appreciates your
efforts in pulling this together." (Id. ¶ 40.)

The parties continued to negotiate the terms of the joint
venture, including exchanging draft letters of intent. (Id. ¶¶
41-44.) They never, however, executed any letter of intent. (Id.
¶ 45.)

Among the potential investors Plaintiffs allegedly
contacted was QInvest, a Qatari financial services firm. (Id. ¶
46.) QInvest and Defendants allegedly moved to exclude
Plaintiffs from the negotiating process and sought to lower

3

Plaintiffs' compensation to 0.5%. (Id. ¶ 51.) In February 2014, QInvest and Defendants executed a letter of intent and thereafter took further steps to exclude Plaintiffs from transactions related to the Property. (Id. ¶¶ 52-54.)

Beginning in June 2014, Plaintiffs sought to resolve what they saw as outstanding issues related to their compensation pursuant to the Capital Raise Agreement. (Id. ¶¶ 56-57.) Macklowe, however, allegedly disclaimed responsibility for compensating Plaintiffs, stating that the fee was to be paid by QInvest. (Id. ¶ 58.) From there, the parties' communications effectively dissolved. (Id. ¶¶ 59-70.)

In the fall of 2014, Plaintiffs negotiated a resolution with QInvest. (Id. ¶¶ 71-72.) On December 23, 2014, Plaintiffs, together with 432 Park Holdings, S.A. ("432 Park Holdings"), executed a Letter Agreement. (Id. ¶ 72; Feuerstein Decl., Ex. O.) The Letter Agreement begins:

> We refer to Project 432 (the "Project"), whereby subject to the terms and conditions of an agreement dated as of 30 April 2014, each of 432 Park Holdings S.A ("432 Park", "we" or "us") and Macklowe Investment Property participated indirectly through MIP 57th Development Acquisition LLC, a Delaware limited liability company (the "Delaware Company"), in the acquisition of the retail and garage component of 432 Park Avenue, New York, New York.

(Feuerstein Decl., Ex. O at 1.) It further states: "This letter is in full and final settlement of any claims against [432 Park Holdings] (and [its] owners and affiliates) that you may have in

4

respect of any breach of any prior agreement to form a Joint Venture." (Id.) The Letter Agreement provides that 432 Park Holdings was to pay $5,000,000 (the "Fee") to Plaintiffs in exchange for undertakings, representations, and warranties detailed therein. (Id.) Among those representations are the following:

> (a) payment of the Fee is in full and final settlement and full satisfaction of our obligations to you in relation to the Project, and you hereby release and forever discharge us in relation thereto;
>
> . . .
>
> (c) you have no right to compensation from, and shall not make any claim, action, suit, or other proceedings whatsoever . . . against the Delaware Company or their subsidiaries, assigns, transferees, representatives, principals, agents, officers or directors (other than against Mr. Harry Macklowe);
>
> (d) you have no right in or against the Project or the [Property] . . . and you shall not make any claim, action, suit or other proceedings whatsoever . . . in relation to the Project or the [Property] . . . and you shall not do anything which may in any way affect the Project or the [Property];
>
> (e) you will not sue, commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against us, the Delaware Company or their subsidiaries, assigns, transferees, representatives, principals, agent, officers or directors (other than against Mr. Harry Macklowe), or against the Project or the [Property] any claim, action, suit or other proceedings whatsoever . . . concerning the Project, or otherwise seek to frustrate the Project in any way, in this jurisdiction or any other.

(Id. at 2.)

II. Discussion

A. Legal Standard for Motion to Dismiss

For a complaint to survive a motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has explained,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556-57). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotation marks and citation omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). The Supreme Court further stated,

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of

6

truth. While legal conclusions can provide the framework
of a complaint, they must be supported by factual
allegations. When there are well-pleaded factual
allegations, a court should assume their veracity and
then determine whether they plausibly give rise to an
entitlement to relief.

Id. at 679.

In considering a Rule 12(b)(6) motion, the Court must
accept as true all factual allegations set forth in the
complaint and draw all reasonable inferences in favor of the
plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508
(2002); Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels &
Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004).
However, this principle is "inapplicable to legal conclusions,"
Iqbal, 556 U.S. at 678, which, like the complaint's "labels and
conclusions," Twombly, 550 U.S. at 555, are disregarded. Nor
should a court "accept [as] true a legal conclusion couched as a
factual allegation." Id. at 555. In resolving a 12(b)(6) motion,
a district court may consider the facts alleged in the
complaint, documents attached to the complaint as exhibits, and
documents incorporated by reference in the complaint. DiFolco v.
MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

B. Defendant Macklowe's Liability

Plaintiffs bring four claims against Harry Macklowe: breach
of written contract (Count I), breach of oral contract (Count
III), unjust enrichment (Count V), and quantum meruit (Count

7

VII). Plaintiffs contend that "Macklowe exercised complete and
total control of the operations of Macklowe Properties with
respect to the Property, the Joint Venture, and the Capital
Raise Agreement" (Compl. ¶ 85), that "[t]o the extent Macklowe
purported to act on behalf of Macklowe Properties with respect
to the Capital Raise Agreement, Macklowe Properties was a mere
instrumentality of Macklowe due to the complete and total
control Macklowe exercised over Macklowe Properties with respect
to the transactions described [in the Complaint]" (id. ¶ 92),
and that "Macklowe abused Macklowe Properties' corporate form by
using it to secure a benefit to himself, in the form of
Plaintiffs' efforts on his behalf and subsequent successful
capital raise, while using it to avoid any obligation to
Plaintiffs to compensate them for that benefit." (Id. ¶ 93.)
Defendants argue in their Motion to Dismiss that Plaintiffs do
not have any direct claims against Macklowe and that they have
not sufficiently alleged that he should be held liable under a
veil-piercing analysis. (Defs.' Mem. Law in Supp. of Mot.
Dismiss ("Defs.' Mem.") at 21-25.)

### 1. Legal Standard for Veil Piercing

"New York courts will pierce the corporate veil and hold a
corporation's owners liable for its debts when '(1) the owners
exercised complete domination of the corporation in respect to

8

the transaction attacked; and (2) such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.'" Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc., 39 F. Supp. 3d 516, 524 (S.D.N.Y. 2014) (quoting Morris v. N.Y.S. Dept. of Taxation & Fin., 82 N.Y.2d 135, 141 (N.Y. 1993)) (alteration omitted).[1] To avoid dismissal, a party seeking to pierce the corporate veil "must come forward with factual allegations as to both elements of the veil-piercing claim." Apex Mar. Co. v. OHM Enters., Inc., No. 10 CIV. 8119 (SAS), 2011 WL 1226377, at *2 (S.D.N.Y. Mar. 31, 2011) (quoting EED Holdings v. Palmer Johnson Acquisition Corp., 228 F.R.D. 508, 512 (S.D.N.Y. 2005)).

In evaluating the first prong of this test, New York courts will consider factors including:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee

---

[1] Although Macklowe Investment Properties, LLC is an LLC rather than a corporation, the same test applies for LLCs. See, e.g., Last Time Beverage Corp. v. F & V Distribution Co., LLC, 951 N.Y.S.2d 77, 81 (N.Y. App. Div. 2d Dep't 2012).

of debts of the dominated corporation by other
corporations in the group, and (10) whether the
corporation in question had property that was used by
other of the corporations as if it were its own.

Am. Federated Title, 39 F. Supp. 3d at 524-25 (quoting Wm.

Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933

F.2d 131, 139 (2d Cir. 1991)).

          2.     Application to Claims Against Macklowe

      Plaintiffs' Complaint essentially recites the elements of

veil piercing without providing any factual support. Such

recitations are not sufficient to survive a motion to dismiss.

See Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank, 552 F.

App'x 13, 15 (2d Cir. 2014); The Cookware Co. (USA), LLC v.

Austin, No. 15 CIV. 5796 (DAB), 2016 WL 7378762, at *4 (S.D.N.Y.

Dec. 8, 2016); Apex Mar., 2011 WL 1226377, at *4; In re Currency

Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385, 426

(S.D.N.Y. 2003) ("The unadorned invocation of dominion and

control is simply not enough.").

      Furthermore, "[a] corporate officer who signs on behalf of

the corporation is not liable unless he signs as an individual

(in addition to signing as the corporate representative)."

Bonnant v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 467 F.

App'x 4, 11 (2d Cir. 2012). To the extent that the November 6,

2013 email created a contract, Macklowe signed it in his

capacity as a corporate representative of MIP given that his

email signature contained "Macklowe Investment Properties."
(Feuerstein Decl., Ex. C at 3.) Accordingly, the claims against
Harry Macklowe (Counts I, III, V, and VII) are DISMISSED.

C. Claims Against Macklowe Investment Properties, LLC

Plaintiffs also bring four claims against MIP: breach of
written contract (Count II), breach of oral contract (Count IV),
unjust enrichment (Count VI), and quantum meruit (Count VIII).

### 1. Whether Plaintiffs Released Any Claims Against MIP

Defendants argue that Plaintiffs released any claims by
accepting a $750,000 payment and by signing the Letter Agreement
with 432 Park Holdings. (Defs.' Mem. at 11-12.) Plaintiffs argue
in opposition that Defendants were not parties to the Letter
Agreement, so they have no standing to enforce them, that there
was no intent to release Defendants, or, in the alternative,
that the releases were ambiguous, making it inappropriate to
address this question at the Motion to Dismiss stage. (Pls.'
Opp. at 6-11.)

As an initial matter, Defendants rely on three documents in
making these arguments. First, Exhibit M to the Feuerstein
Declaration, which is a series of emails dated April 29-30, 2014
between Vaughn Weatherdon, Tanim Al-Kawari, and Halwani. As
noted supra p. 7, the Court may consider the facts alleged in

the Complaint, exhibits to the Complaint, and documents incorporated by reference in the Complaint. <u>DiFolco</u>, 622 F.3d at 111. A document referenced in the complaint may only be considered part of the pleadings if the complaint makes "a clear, definite and substantial reference to the documents." <u>Helprin v. Harcourt, Inc.</u>, 277 F. Supp. 2d 327, 330-331 (S.D.N.Y. 2003); <u>see also</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) ("[P]laintiff's reliance on the terms and effect of a document in drafting the complaint [is] a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); <u>Goldman v. Belden</u>, 754 F.2d 1059, 1066 (2d Cir. 1985) (holding that limited quotation of documents not attached to the complaint is not enough to constitute incorporation by reference). There is no reference to the April 29-30, 2014 emails (Feuerstein Decl., Ex. M) in the Complaint. When a party submits affidavits or other evidence outside the pleadings attached to or in response to a Rule 12(b)(6) motion, "a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material.'" <u>Friedl v. City of New York</u>, 210 F.3d 79, 83 (2000) (quoting <u>Fonte v. Bd. of Managers of Cont'l Towers Condo.</u>, 848 F.2d 24, 25 (2d

Cir. 1988)). Here, the Court excludes Exhibit M to the Feuerstein Declaration. Exhibit N, which purports to evidence the $750,000 transfer, is excluded for the same reason.

Exhibit O to the Feuerstein Declaration is an executed copy of the Letter Agreement between 432 Park Holdings and Plaintiffs. The Letter Agreement is discussed at some length in Plaintiffs' Complaint (Compl. ¶¶ 71-78) and is therefore incorporated by reference in the Complaint. The Court thus considers the Letter Agreement in deciding Defendants' Rule 12(b)(6) Motion to Dismiss. Accordingly, the Court addresses arguments regarding release of claims solely based on the Letter Agreement.

### a. Applicable Law

Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release. If the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties." Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V., 17 N.Y.3d 269, 276 (N.Y. 2011) (citations and quotations omitted). The "meaning and coverage of a general release depends upon the purpose for which the release was actually given, and a general release may not be read to cover matters which the parties did not desire or intend to dispose of." Mazzurco v. PII Sam, LLC, 63 N.Y.S.3d 59, 60 (N.Y. App. Div. 2d Dep't 2017)

(internal quotations omitted) (quoting <u>Huma v. Patel</u>, 890

N.Y.S.2d 639, 640 (N.Y. App. Div. 2d Dep't 2009)).

In this case, Defendants are not a party to the Letter

Agreement.

> Parties asserting third-party beneficiary rights under
> a contract must establish "(1) the existence of a valid
> and binding contract between other parties, (2) that the
> contract was intended for [their] benefit and (3) that
> the benefit to [them] is sufficiently immediate, rather
> than incidental, to indicate the assumption by the
> contracting parties of a duty to compensate [them] if
> the benefit is lost."

<u>Mendel v. Henry Phipps Plaza W., Inc.</u>, 6 N.Y.3d 783, 786 (N.Y.

2006) (alteration in original) (quoting <u>Burns Jackson Miller</u>

<u>Summit & Spitzer v. Lindner</u>, 59 N.Y.2d 314, 336 (N.Y. 1983)).

### b. Application to the Letter Agreement

MIP is not a party to the Letter Agreement.[2] Whether the

parties to the Letter Agreement intended it to release any

claims against MIP is inappropriate to resolve on a Motion to

Dismiss. See <u>Info. Superhighway, Inc. v. Talk Am., Inc.</u>, 274 F.

Supp. 2d 466, 470 (S.D.N.Y. 2003) ("an ambiguous release may not

form the basis for a motion to dismiss"). Plaintiffs explicitly

release any claims against an MIP affiliate, MIP 57th

Development Acquisition LLC, but do not expressly release claims

---

[2] Because the Court has found that Macklowe cannot be held
individually liable, it does not address the carve-out in the
Letter Agreement for claims against him.

against MIP itself. (Feuerstein Decl., Ex. O at 1-2.) While the Letter Agreement expressly carves out claims against Macklowe, it contains no such provision for MIP. (See id. at 2.) And although Paragraph (d) contains a broad statement, saying Plaintiffs "shall not make any claim, action, suit, or other proceedings whatsoever" in relation to the Property, the Court cannot definitely say at this time that this provision was intended to cover MIP.

> 2. Whether the November 6, 2013 Email Created a Binding Contract – Breach of Contract Against MIP (Count II)

Because the Court has held that it cannot dismiss on the basis of the Letter Agreement, it next addresses the remainder of Defendants' arguments in support of their Motion to Dismiss. Defendants also argue that there never was a binding agreement between the parties. They first argue that a previously executed confidentiality agreement required the parties to enter a definitive agreement. (Defs.' Mem. at 16.) The Confidentiality Agreement, however, is not incorporated by reference in the Complaint, so the Court declines to consider it at the Rule 12(b)(6) Motion to Dismiss stage. Defendants further argue that the November 6, 2013 email, or the Capital Raise Agreement as Plaintiffs call it, did not constitute a meeting of the minds.

### a. Applicable Law

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc., 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006). In other words, "there must be a meeting of the minds as to the material terms of the agreement . . . [or] a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Metro. Enters. N.Y. v. Khan Enter. Constr., Inc., 1 N.Y.S.3d 328, 329 (N.Y. App. Div. 2d Dep't 2015) (internal citations and quotations omitted). Still, parties "should be held to their promises and courts should not be 'pedantic or meticulous' in interpreting contract expressions." Id. (quoting Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 483 (N.Y. 1989)).

### b. Application to Count II

Macklowe's November 6, 2013 email states, inter alia, "I think a 2% fee will work." (Feuerstein Decl., Ex. C at 3 (emphasis added).) Macklowe's email is too equivocal and ambiguous to constitute a valid acceptance. See King v. King, 617 N.Y.S.2d 593, 594 (N.Y. App. Div. 3d Dep't 1994) ("As a general rule, in order for an acceptance to be effective, it

must comply with the terms of the offer and be clear, unambiguous and unequivocal.").

Further emails, incorporated by reference in Plaintiffs' Complaint, indicate that the parties had not come to a binding agreement. For example, on December 11, 2013, Kimmelman wrote to Alkholi, "We never finalized the deal structure," and "we need to finalize the compensation agreement for the capital raise." (Feuerstein Decl., Ex. D at 1.) Although Kimmelman goes onto say, "our agreement was to pay 2% for the equity raise," he continues, "There were some conversations with Mr. Halawani that he also wanted 40% of the GP as compensation and 20% additional for QInvest if they raised money. That is a change to the structure that we discussed and we need to finalize." (Id. (emphasis added).) The parties plainly had not agreed to all material terms, so there is no binding contract. See Metro. Enters. N.Y., 1 N.Y.S.3d at 329; Rubinstein v. Clark & Green, Inc., 395 F. App'x 786, 788 (2d Cir. 2010) ("While an exchange of emails may constitute a binding contract under New York law, that is not the case where the parties contemplate further negotiations and the execution of a formal instrument.") (citations and quotations omitted). Accordingly, Count II of the Complaint for breach of written contract against MIP is DISMISSED.

17

3.    Statute of Frauds – Quasi-Contract Claims
(Counts IV, VI, and VIII)

Defendants next argue that the Statute of Frauds, N.Y. Gen.
Oblig. Law ("G.O.L.") § 5-701, requires dismissal of Counts IV
(breach of oral contract), VI (unjust enrichment), and VIII
(quantum meruit) against MIP. (Defs.' Mem. at 13-15.) Plaintiffs
argue that their claims are not covered by the Statute of Frauds
(Pls.' Mem. at 11-13), or, in the alternative, that there is a
writing that satisfies the Statute of Frauds. (Id. at 13-15.)
There are thus two questions at issue here: (1) whether the
claims in question are covered by the Statute of Frauds and (2)
if so, whether the writings cited by Plaintiffs are sufficient
to satisfy the Statute of Frauds.

a. Whether the Statute of Frauds Is Applicable

The Statute of Frauds is meant "to guard against the peril
of perjury; to prevent the enforcement of unfounded fraudulent
claims." Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 574 (N.Y.
1969). Under General Obligations Law § 5-701(a)

> Every agreement, promise or undertaking is void, unless
> it or some note or memorandum thereof be in writing, and
> subscribed by the party to be charged therewith, or by
> his lawful agent, if such agreement, promise or
> undertaking: . . .
>
> Is a contract to pay compensation for services rendered
> in negotiating a loan, or in negotiating the purchase,
> sale, exchange, renting or leasing of any real estate or
> interest therein, or of a business opportunity,
> business, its good will, inventory, fixtures or an

18

> interest therein, including a majority of the voting
> stock interest in a corporation and including the
> creating of a partnership interest. "Negotiating"
> includes procuring an introduction to a party to the
> transaction or assisting in the negotiation or
> consummation of the transaction. This provision shall
> apply to a contract implied in fact or in law to pay
> reasonable compensation . . . .

G.O.L. § 5-701(a)(10).

In analyzing the statute, the New York Court of Appeals has turned to the text of the statute and has distinguished cases involving two co-brokers, where a writing is typically not required, and those involving a broker and a principal, where a writing typically is required. See JF Capital Advisors, LLC v. Lightstone Group, LLC, 25 N.Y.3d 759, 766-67 (N.Y. 2015); Snyder v. Bronfman, 13 N.Y.3d 504, 509-10 (N.Y. 2009); Dura v. Walker, Hart & Co., 27 N.Y.2d 346, 348-51 (N.Y. 1971). The Court of Appeals has described cases involving a broker and a principal as ones in which a plaintiff-broker provides "know-how" or "know-who," or "the use of connection, ability, and knowledge to arrange for defendants to meet appropriate persons in their business pursuits." JF Capital Adivsors, 25 N.Y.3d at 767 (alterations and quotations omitted) (quoting Freedman v. Chemical Constr. Corp., 43 N.Y.2d 260, 267 (N.Y. 1977)).

The claims in question are covered by the Statute of Frauds. This finding is supported by the text of the statute. Plaintiffs plead that they were to provide Defendants access to

their "valuable network of wealthy and influential contacts" in order to provide financing for the proposed development. (Compl. ¶ 8.) This is covered by the statutory language of: "services rendered . . . in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity." G.O.L. § 5-701(a)(10). The law explicitly states that "'[n]egotiating' includes procuring an introduction to a party to the transaction." Id.

The Court's determination is also supported by a review of relevant case law. For example, in Snyder v. Bronfman, 13 N.Y.3d 504 (N.Y. 2009), a plaintiff who worked to put together acquisitions for a joint ventures by, among other things, developing "a series of business relationships in the corporate and investment banking communities," was held to have been seeking compensation for services rendered in negotiating the purchase of a business opportunity, business, or an interest therein. Id. at 507-09; see also Learning Annex Holdings, LLC v. Rich Glob., LLC, No. 09 CIV. 4432 (SAS), 2011 WL 2732550, at *4 (S.D.N.Y. July 11, 2011) (holding that Plaintiff's "alleged introduction of [Defendant] to [a third party] clearly constitutes 'procuring an introduction to a party to the transaction.'"). By contrast, in JF Capital Advisors, LLC v. Lightstone Grp., LLC, 25 N.Y.3d 759 (N.Y. 2015), the New York Court of Appeals held that services performed by a plaintiff to

determine whether to negotiate for potential real estate acquisitions, rather than in furtherance of negotiation, were not covered by the Statute of Frauds. Id. at 765-67.

The instant cases are more similar to Snyder in that Plaintiffs were to introduce Defendants to a series of contacts in order to raise funds for a joint venture. Snyder v. Bronfman, 13 N.Y.3d at 507-09. The plaintiffs in JF Capital Advisors had advised the defendants on whether to attempt to acquire various properties, making that case factually distinctive. JF Capital Adivsors, 25 N.Y.3d at 765-67. In reviewing these cases, the Court relies on the Court of Appeals determination that cases involving "know-who" are encompassed by the Statute of Frauds. Id. at 767.

Plaintiffs contend that the dangers the Statute of Fraud seeks to preclude "are absent where the relationship between the parties is not of a transitory nature." (Pls.' Mem. at 12 (citing Dura, 27 N.Y.2d at 349.) Dura v. Walker, Hart & Co., 27 N.Y.2d 346 (N.Y. 1971), stands for the proposition that agreements between co-brokers to split a finder's fee need not be in writing. Id. at 349. The Court of Appeals in that case noted that "the plaintiff relies on a theory closely akin to that of joint venture, with its overtones of fiduciary obligation, in which situations, we note, there is no requirement that there be a writing to evidence the agreement."

Id. The Court itself, however, did not specifically endorse the idea that agreements involving joint ventures are not covered by the Statute of Frauds. See id. Further, the Court of Appeals has more recently held that an agreement concerning a joint venture involving an ongoing business relationship still required a writing. See Snyder, 13 N.Y.3d at 507-08 (relationship spanned from 2001 to 2004).

### b. Whether the Writings in Question Satisfy the Statute of Frauds

Because the Court has determined that G.O.L. § 5-701(a)(10) applies here, the next question is whether the writings provided by the parties sufficiently describe the terms of the purported agreement so as to satisfy the Statute of Frauds. In Morris Cohon & Co. v. Russell, 23 N.Y.2d 569 (N.Y. 1969), while citing "the well-established rule that in a contract action a memorandum sufficient to meet the requirements of the Statute of Frauds must contain expressly or by reasonable implication all the material terms of the agreement, including the rate of compensation if there has been agreement on that matter," the New York Court of Appeals held:

> In an action in Quantum meruit, however, for the reasonable value of brokerage services, if it does not appear that there has been an agreement on the rate of compensation, a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services. The obligation of the

> defendant to pay reasonable compensation for the
> services is then implied.

Id. at 575-76. Courts applying New York law, however, "have dismissed quantum meruit claims under the Statute of Frauds where the writings relied upon failed to establish that the defendant actually agreed to pay a finder's fee, or where the writings left ambiguity as to whether the agreement's terms covered the transaction upon which a fee was claimed." Springwell Corp. v. Falcon Drilling Co., 16 F. Supp. 2d 300, 305-06 (S.D.N.Y. 1998) (collecting cases).

The emails provided by the parties provide sufficient writing to survive a Motion to Dismiss. Specifically, they create a plausible claim that MIP may have employed Plaintiffs to render the alleged services. See Morris Cohon, 23 N.Y.2d at 575-76. Courts applying New York law "have been particularly willing to entertain quantum meruit claims where despite its other shortcomings or ambiguities, a defendant's writing expressly acknowledges that the plaintiff performed requested services." Springwell Corp., 16 F. Supp. 2d at 315 (collecting cases); see also Davis & Mamber, Ltd. v. Adrienne Vittadini, Inc., 622 N.Y.S.2d 706, 707 (N.Y. App. Div. 1st Dep't 1995) ("[D]efendants' letter to an entity in the business of brokering licensing agreements, which letter authorized that entity to

approach certain manufacturers, could hardly have been an authorization contemplating gratuitous services.").

Here, the Court has primarily discussed quantum meruit, but its analysis also applies to Plaintiffs' unjust enrichment and breach of oral contract against MIP. Under New York law, courts "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005). "New York law does not permit recovery in quantum meruit . . . if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." Id. However, "a valid contract bars a quantum meruit action only where 'the scope of [the contract] clearly covers the dispute between the parties.'" Id. (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (N.Y. 1987)). "'[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories where . . . the contract does not cover the dispute in issue.'" Id. (quoting Curtis Props. Corp. v. Greif Cos., 653 N.Y.S.2d 569, 571 (N.Y. App. Div. 1st Dep't 1997)); see also Fed. R. Civ. P. 8(d)(2)-(3) (noting that a plaintiff may plead claims in the alternative, even if they are inconsistent). While Plaintiffs cannot ultimately recover on both oral contract and quasi-contract

claims, they can proceed with both types of claims at this stage of the litigation.

     D. Leave to Amend

     The Court has dismissed all Counts against Macklowe (Counts I, III, V, and VII) and Count II against MIP. The remaining question is whether Plaintiff shall be given leave to replead. When a complaint has been dismissed, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, a court may dismiss without leave to amend when amendment would be "futile," or would not survive a motion to dismiss. Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 491 (2d Cir. 2011). Because any negotiations carried out by Macklowe were done by him in his capacity as a corporate representative, Plaintiffs cannot make out a claim against him and leave to amend is DENIED with respect to the Counts against him (Counts I, III, V, and VII). There was no meeting of the minds with respect to Plaintiffs' written contract claim against MIP, as evidenced by the emails discussed by the Court. Leave to amend is also DENIED with respect to Counts II.

III.  CONCLUSION

     For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The remaining Defendant,

Macklowe Investment Properties, LLC, is to answer Plaintiffs'
Complaint within 45 days of the date of this Memorandum & Order.

SO ORDERED.

DATED:     New York, NY
           December 22, 2017


                         Deborah A. Batts
                    United States District Judge