UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
HAMZA B. ALKHOLI and
AHMED HALAWANI,

                           Plaintiffs,                      17-cv-16 (PKC)

        -against-                                 OPINION
                                                        AND ORDER

MACKLOWE INVESTMENT
PROPERTIES, LLC,

                           Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiffs Hamza B. Alkholi and Ahmed Halawani, citizens of Saudi Arabia, brought various claims against Macklowe Investment Properties, Inc. ("MIP") and Harry B. Macklowe arising out of a purported joint venture for the acquisition and development of the retail component of 432 Park Avenue in Manhattan (the "Project"). The late Judge Deborah A. Batts dismissed all claims against Harry Macklowe, the individual, and the breach of written contract claim against his company, MIP. (Opinion and Order of Dec. 22, 2017 (Doc 23).)

        MIP now moves for summary judgment on the three remaining claims—breach of an oral contract, unjust enrichment, and quantum meruit. (Doc 39.) For reasons to be explained, the Court concludes that the claims are barred by New York's Statute of Frauds, N.Y. G.O.L. § 5-701(10). The writings signed and unsigned, taken together, confirm that the parties discussed and agreed that plaintiffs would receive a 2% fee but that it would be paid out of a joint venture that never came into existence. No writing evidences an agreement by MIP to pay a 2% fee out of its own funds, which is the contention that forms the basis of plaintiffs' claims. Therefore, defendant MIP's motion will be granted.

BACKGROUND

        A. <u>Overview of the Facts</u>

Harry Macklowe of MIP contacted Dr. Alkholi on October 24, 2013 inquiring whether Alkholi had interest in exploring a possible investment in the Project. (Alkholi Decl. (Doc 46), Ex. 1.) Few details were initially provided. (<u>Id.</u>) In order to obtain background information, Alkholi was asked to sign a non-disclosure agreement (the "Confidentiality Agreement"), which he signed on behalf of one of his companies, HK Petroleum Services. (<u>Id.</u> ¶ 3; Kimmelman Decl. (Doc 42), Ex. A.) The Confidentiality Agreement obligated Alkholi to keep information about the Project confidential and further provided that "Macklowe shall have no legal or equitable commitment or obligation to Recipient with respect to the Property unless and until a written agreement with respect to the Property has been fully executed and delivered by Macklowe to Recipient . . . ." (Doc 42, Ex. A ¶ 9.)

Macklowe, according to Alkholi, suggested that MIP and Alkholi form a joint venture whereby Alkholi would participate as an investor in the Project, and he would also personally solicit additional investors for the Project. (Doc 46 ¶ 4.) The parties discussed a placement fee of 2% of the "capital raise." (<u>Id.</u>) In his recounting of the discussion with Macklowe, Alkholi does not state that they discussed who would pay the fee, <u>e.g.</u>, MIP, the proposed joint venture, or some other investment vehicle. (<u>Id.</u> ¶ 5.) According to Alkholi, Macklowe initially proposed a 1.5% fee and Alkholi countered with a 2% fee. (<u>Id.</u> ¶ 7.)

In an email dated November 6, 2013, about two weeks after the initial contact, Macklowe wrote: "Hamza, glad you are interested in the deal, I think a 2% fee will work. . . .You have permission to speak to your potential partners. Just send us their names." (Doc 42, Ex. B.) The November 6 email does not include any mention of who would pay this 2% fee. At that moment in time, the Project's deal structure had not been finalized.

Alkholi sent MIP a list of individuals who Alkholi intended to contact as potential investors. (Doc 46 ¶ 9.) Bruce Kimmelman of MIP responded that MIP had no objection to the names on the list. (Id. ¶ 10.) Names were subsequently added to the list without objection. One was Ahmed Halawani, Alkholi's co-plaintiff in this action. (Id. ¶ 12.) While the exact nature of the relationship between Alkholi and Halawani is not delineated in the submissions to this Court, the two agreed to share any placement fee. (Doc 46 ¶ 16; Halawani Decl. (Doc 45) ¶ 7.) In their dealings with MIP, they acted as de facto partners.

Another potential investor added to the list was H.H. Sheikh Hamad Bin Jassim bin Jaber Al-Thani ("HBJ"). HBJ is the former Prime Minister of Qatar and chairman of its sovereign wealth fund, the Qatar Investment Authority. (David Decl. (Doc 44), Ex. 3.) It was understood that any investment by HBJ would be vetted through QInvest, a financial services firm led by HBJ's son. (Id.; Doc 23 at 3.)

Email discussions as to the deal structure continued between Bruce Kimmelman of MIP and plaintiffs. The issue of who would pay the 2% placement fee also became the topic of email traffic. In an email of December 20, 2013, Kimmelman wrote about the deal structure and also the placement fee: "[T]he 2% placement fee (which you reference being rolled into the deal with the other partners) will be a 'deal' cost included in the total capitalization of which all parties will share in the cost." (Def.'s 56.1 ¶ 19; Pls.' 56.1 ¶ 19; Doc 42, Ex. F.) In response, Halawani responded: "Good enough . . ." (Doc 42, Ex. F.)

MIP and plaintiffs also exchanged draft term sheets, none of which was ever executed. (Doc 42, Ex. G; Doc 46, Ex. 8.) The draft term sheets reflected the creation of a joint venture, and that plaintiffs would receive a 2% placement fee. But the contemplated joint venture never materialized. Instead, HBJ decided that he wanted to be the sole investor and did

not want a joint venture with anyone.  The Project went forward with no investment by Alkholi or Halawani.  On February 11, 2014, Kimmelman sent plaintiffs a copy of a term sheet executed by Macklowe on behalf of MIP, and Craig Cowie on behalf of QInvest.  (Doc 42, Ex. H.)  The executed term sheet reflected that plaintiffs would receive a placement fee of 0.5% of the capital raise.  (Id.)  Plaintiffs repeatedly characterize the 0.5% placement fee as a "finders fee from the investor-side of the deal" that had no effect on the 2% placement fee they allege MIP owes them.  (Pls.' 56.1 ¶¶ 26-28, 36-37, 39.)

In April 2014, QInvest agreed to pay the 0.5% placement fee jointly to Alkholi and Halawani, which amounted to $750,000; they accepted and received this payment.  (Doc 46 ¶ 39; Doc 45 ¶ 30; Doc 42, Exs. P, Q.)  In addition, Alkholi and Halawani were paid $5 million by HBJ for the lost opportunity to participate in the joint venture for which HBJ became the sole funding source.  (Doc 46 ¶¶ 50-52; Doc 45 ¶¶ 40-42; Feuerstein Decl. (Doc 41), Ex. A.)

### B. The Complaint and Prior Proceedings

Plaintiffs' complaint pled a claim for breach of a written agreement for a placement fee.  "Through these e-mails, Macklowe and Kimmelman bound [MIP] to a written bargain under which Plaintiffs would receive, in return for securing the necessary capital, a fee equal to 2.0% of the capital raised."  (Compl. (Doc 1) ¶ 109.)  Judge Batts dismissed the written contract claim, concluding that "[t]he parties plainly had not agreed to all material terms, so there [was] no binding contract."  (Doc 23 at 17.)  Judge Batts also dismissed all claims against Harry Macklowe in his individual capacity.  (Id. at 11.)

Plaintiffs' complaint alternatively alleged that there was an oral agreement between plaintiffs and MIP entitling plaintiffs to a 2% placement fee.  The fourth cause of action asserts: "In the alternative, the e-mails evidence the binding oral contract between them."

(Compl. ¶ 141.) Judge Batts denied the motion to dismiss the breach of an oral agreement claim against MIP, as well as the claims against MIP for unjust enrichment and quantum meruit. (See Doc 23.)

MIP now moves for summary judgment, asserting that there was no meeting of the minds on the subject of payment of a placement fee, that any agreement was subject to the requirement of the Confidentiality Agreement that there be a fully-executed and delivered agreement, and that any claim against MIP has been released. It also asserts that the Statute of Frauds bars plaintiffs' claims. The Court finds it unnecessary to reach MIP's arguments beyond the Statute of Frauds.

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks and citation omitted).

It is the initial burden of the movant to come forward with evidence on each material element of his claim or defense sufficient to entitle the movant to relief as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). If the

moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009) (internal citations omitted).

Further, a district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Simpson v. City of N.Y., 793 F.3d 259, 265 (2d Cir. 2015) (internal quotation marks and citation omitted). It is not appropriate for the Court to make credibility assessments or resolve conflicting versions of events; these are essential questions for a jury. Id.; Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996) (courts do not "weigh the evidence" when deciding a summary judgment motion).

DISCUSSION

  A. Choice of Law

The parties do not address which jurisdiction's law governs plaintiffs' claims. However, the real estate development Project was located in New York and the parties have briefed the motion on the assumption that New York law governs. "'[I]mplied consent . . . is sufficient to establish choice of law.'" Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138

(2d Cir. 2000) (quoting <u>Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton</u>, 888 F.2d 239, 242 (2d Cir. 1989)).  Therefore, the Court applies New York law here.

   B.  <u>Statute of Frauds</u>

The New York Statute of Frauds continues to play an outcome-determinative role for purported agreements falling within its ambit.  See <u>R.B. Hamilton & Assocs., Inc. v. Gibbons Green & van Amerongen, Ltd.</u>, 169 A.D.2d 554, 555 (1st Dep't 1991) (the Statute of Frauds serves New York's "paramount interest in protecting against unfounded claims, and the possibility of erroneous verdicts.").  Insofar as is relevant to this case, the Statute requires a writing signed by the party to be charged in the following instance:

> [A] contract to pay compensation for services rendered . . . in negotiating the purchase, sale, exchange, . . . of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, . . . including the creating of a partnership interest.

N.Y. General Obligations Law ("G.O.L.") § 5-701(a)(10).  It defines the term "negotiating" to include "procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction."  <u>Id.</u>  The essence of the plaintiffs' oral contract claim is that they are entitled to compensation for "procuring an introduction to a party," or a prospective party, to a real estate transaction.  As Judge Batts already determined, the Statute comfortably covers the purported agreement alleged by plaintiffs, and this Court adheres to that ruling.  (Doc 23 at 18-19.)

To satisfy the Statute, a note or memorandum evidencing the agreement must be in writing and signed by the party against whom it is sought to be enforced or that party's agent.  N.Y. G.O.L. § 5-701(a) ("Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent. . . .").  Further, "[t]he writing required by the Statute must contain all

- 7 -

material terms of the agreement." Springwell Corp. v. Falcon Drilling Co., 16 F. Supp. 2d 300, 303 (S.D.N.Y. 1998) (Sotomayor, J.) (citing Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 575 (1969)). To fulfill the "memorandum" requirement, New York permits "signed and unsigned writings to be read together, provided that they clearly refer to the same subject matter or transaction." Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 55 (1953).

"While oral testimony may be admissible to show a connection between a signed writing and an unsigned writing related to the same transaction, such testimony cannot be used to create an agreement not found in the writings." Springwell Corp., 16 F. Supp. 2d at 309 (citing Scheck v. Francis, 26 N.Y.2d 466, 470-72 (1970)). Thus, while parol evidence can provide a link between signed and unsigned documents, the New York Court of Appeals has noted that the writings themselves must contain the material terms. "Parol evidence . . . is immaterial to the threshold issue whether the documents are sufficient on their face to satisfy the Statute of Frauds. . . . That issue must be determined from the documents themselves, as a matter of law." Bazak Int'l Corp. v. Mast Indus., Inc., 73 N.Y.2d 113, 118 (1989).

The obligor's identity is unquestionably a material term of an agreement. The question presented on this motion is whether the signed and unsigned writings, taken together, include an obligation on the part of MIP to pay plaintiffs a placement fee out of its own funds.

The Court begins its analysis with the November 6 email from Macklowe to Alkholi, sent about two weeks after their first contact about the Project:

> Glad you are interested in the deal. I think a 2% fee will work. Hope there is no conflict with the people we are talking to. We will discuss that later. You have permission to speak to your potential partners. Just send us their names.
>
> We'll be in touch with you shortly.
>
> Regards,

>Harry

(Pls.' 56.1 ¶ 12; Doc 42, Ex. B.)  Beneath "Harry" is the signature block:

>Harry Macklowe
>Macklowe Properties
>767 Fifth Avenue
>New York, New York 10153

(Doc 42, Ex. B.)

The Court concludes that, in context, affixing the name "Harry" to the email coupled with the signature block was sufficient to satisfy the Statue's requirement that the writing be "subscribed."  N.Y. G.O.L. §5-701(b)(4).  "'An e-mail sent by a party, under which the sending party's name is typed, can constitute a [signed] writing for [the] purposes of the statute of frauds.'"  Agosta v. Fast Sys. Corp., 136 A.D.3d 694, 695 (2d Dep't 2016) (quoting Newmark & Co. Real Estate Inc. v. 2615 E. 17 St. Realty LLC, 80 A.D.3d 476, 477 (1st Dep't 2011)).

A series of email exchanges between Bruce Kimmelman and Alkholi and Halawani reflect that MIP and plaintiffs were still negotiating the deal structure even after Macklowe's November 6 email to Alkholi.  Kimmelman stated that the 2% fee—which he unsuccessfully attempted to negotiate down to 1.5%—would be part of the "deal structure," meaning that it would be paid pro rata by all investors in the deal.  Kimmelman's subsequent December 11, 2013 email, and more importantly, Halawani's response to it, show that MIP and plaintiffs did not consider the November 6 email to reflect a meeting of the minds on who would pay the fee.  Kimmelman's December 11, 2013 email states in relevant part:

>We never finalized the deal structure when you were in New York, but we outlined to you and Mr. Halawani the structure (see attached DRAFT JV term sheet . . . .)
>
>Also - we need to finalize the compensation agreement for the capital raise. As we agreed to (see below) our agreement was to pay 2% for the equity raised. There

>were some conversations with Mr. Halawani that he also wanted 40% of the GP [General Partner] as compensation and 20% additional for QInvest if they raised money. That is a change to the structure that we discussed and we need to finalize.

(Doc 42, Ex. D.) Days later, Kimmelman wrote to Halawani:

>[W]anted to get back to you on a compensation structure. Our proposal is outlined below:
>
>>1) Fee: 1.50% of equity raised (capitalized within the deal)
>>
>>2) GP [General Partner] Promote Share:
>>
>>>Equity Raise of 50 to 75% of Total Equity: GP Promote Share would increase proratably from 15% - 30%
>>>
>>>Equity Raise of 75+ to 95% of Total Equity: GP Promote Share would increase proratably from 30% - 49%
>>
>>3) Halawani/Al Kholi [sic] Equity Requirement: Contribute $10 mil of equity required to be funded at contract signing and as part of the deal deposit along with Macklowe equity. Such amount to be retained within the deal and be treated pro-rata with all equity.
>
>The above noted compensation / deal structure is predicated upon the JV terms and structure we discussed for the investors as outlined in the attached term sheet other than we are agreeable to a slight change (market dependent) on the first hurdle to be discussed.

(Doc 42, Ex. E.) Halawani responded the same day: "Reviewing your counteroffer and will get back to you . . . . My initial reaction though [is] that we are so far apart. Numbers are way below my expectations." (Id.) If Halawani believed that all material terms had been resolved in the November 6 email exchange between Alkholi and Macklowe, Halawani would not have responded as he did, and would have treated Kimmelman's email as a reneging of an agreement, not as a "counteroffer." On December 19, Halawani responded with his and Alkholi's "position on the placement and carry fees":

>Placement fee of 2% in all cases.
>
>Carry:

- 10 -

>1) Below 50% of the required equity we get nothing.
>
>2) from 50% to 60% we get 35% of the economics of the GP [General Partner]
>
>3) from 60% to 70% we get 40% of the economics of the GP
>
>4) from 7% [sic] to 80% we get 45% of the economics of the GP
>
>5) 80% and above we get 55% of the economics of the GP
>
>To avoid any ambiguity the above is based on a total equity between USD 450 to 500 million for the acquisition of both assets.
>
>I will get back to you by tomorrow to discuss all of your other fees in details.

(Doc 42, Ex. F.)

Kimmelman and Halawani were contemporaneously discussing plaintiffs' own investment of capital into the joint venture. (See id.) In Halawani's words: "As we discussed in your office Dr. [Alkholi] and myself will contribute at risk deposit to the GP and it will be between $7.5 million to $10 million. This is on too [sic] of the 2% placement fee <u>that will be rolled in with the other partners</u>." (Id.) (emphasis added). Kimmelman responded to Halawani's email on December 20, 2013 that the 2% placement fee being discussed would be a "'deal' cost included in the total capitalization of which all parties will share in the cost." (Id.)

In response to Kimmelman's email, in his December 20, 2013 email, Halawani wrote: "Good enough . . ." (Id.) At this point, Halawani and Alkholi were agreeing with MIP that the 2% placement fee would be paid by the joint venture in which Halawani and Alkholi would be investors. In other words, each member would be paying in accordance with their pro rata interest in the joint venture. Until December 20, 2013, there was no meeting of the minds reflected in any writing or series of writings satisfying the Statute of Frauds. The December 20 writings make plain that it was the to-be-created joint venture, in which Halawani and Alkholi were to be members, and not MIP, that would pay any placement fee to plaintiffs.

But the contemplated joint venture never came into existence. Instead, the deal evolved further. HBJ insisted on becoming the sole investor and neither Halawani nor Alkholi

- 11 -

became investors in the deal.  Subsequently, HBJ and his related entities agreed to pay a $750,000 fee to plaintiffs, which reflected 0.5% of the capital raise.  (Doc 45 ¶ 23; Doc 46 ¶ 39.)  HBJ and his related entities further compensated plaintiffs $5 million for their lost opportunity to become investors in the Project.  (Doc 45 ¶¶ 40-41; Doc 46 ¶¶ 50-51.)

Plaintiffs argue that Halawani's "Good enough" response was intended to reflect assent to other parts of Kimmelman's December 20 email and not to the 2% being a "deal cost" to be shared among investors.  (Pls.' 56.1 ¶ 20; Doc 45 ¶ 16.)  This argument fails for several reasons.  First, the interpretation plaintiffs offer is not a reasonable construction of Halawani's written response to Kimmelman.  Nowhere does Halawani specify that he was only agreeing to part of Kimmelman's email describing the deal structure.  One would expect that a party who considered the identity of the obligor to have been resolved in a November 6 signed writing would have reacted swiftly and negatively, and not with the words "Good enough."  Second, the point of the Statute of Frauds is to require that the material terms be in writing.  If Halawani intended his "Good enough" statement to communicate silence in response to Kimmelman's December 20 email insofar as it related to the placement fee, his silence does not aid plaintiffs' effort to establish the existence of writings signed and unsigned that show that MIP was to be the obligor of the 2% placement fee.

At the time of Harry Macklowe's November 6 email, there was no meeting of the minds between Macklowe, acting for MIP, and Alkholi as to the identity of the party who would pay the 2% placement fee.  There is no other writing that would permit the term to be read into the November 6 email.  The chain of correspondence supports the conclusion that the interrelated questions of the structure of the deal and the identity of who would pay a fee was up in the air until December 20, 2013, when Halawani accepted the "[p]oint of clarification," communicated by Kimmelman, that the "2% placement fee . . . will be a "deal' cost included in the total capitalization of which all parties will share in the cost."  (Doc 42, Ex. F.)  Further, it

bears noting that in the drafted term sheets that plaintiffs and MIP were exchanging through January 2014, the "GP Investor Placement Fee" section provided: "In lieu of payment of the Placement Fee <u>by the Joint Venture</u> to the GP Investor, GP Investor may receive membership interests in the Joint Venture together with a capital account in an amount equal to the Placement Fee."  (Doc 42, Ex. G; Doc 46, Ex. 8 (markup, replacing "GP" with "HA" to refer to plaintiffs).) (emphasis added).  This writing, although unsigned, evidences that the 2% placement fee, if it were to be paid, would come from the future joint venture, not from MIP's own assets.

Contrary to plaintiffs' arguments, the evidence does not demonstrate that the placement fee was conceptually separate from the deal structure.  In fact, the deal structure was integral to the identity of who would pay the fee.  The evidence on this summary judgment motion, beyond the subjective beliefs of the plaintiffs, does not support plaintiffs' assertion that MIP agreed on November 6, 2013 to pay the fee, and that all that transpired following that moment in time is legally irrelevant.  Just as <u>Crabtree</u> allows subsequent correspondence to fill in the missing pieces, here, the subsequent correspondence negates plaintiffs' claim of an enforceable oral contract.  305 N.Y. at 54-55.

Nor does the circumstance that MIP green-lighted a list of potential investors and the distribution of information to them by Alkholi save plaintiffs' claim from the Statute of Frauds.  New York courts have rejected claims that an agreement governed by N.Y. G.O.L. § 5-701 may be enforced by reason of part performance.  <u>Valentino v. Davis</u>, 270 A.D.2d 635, 637 (3d Dep't 2000) (citing <u>Messner Vetere Berger McNamee Schmetterer Euro RSCG v. Aegis Grp. PLC</u>, 93 N.Y.2d 229, 234 n.1 (1999)) ("To the extent that plaintiff attempts to avoid the Statute of Frauds defense by arguing that the doctrine of part performance should be applied, we reject this argument.  The Court of Appeals has recently clarified that the doctrine of part performance cannot save contracts governed by General Obligations Law § 5–701 . . . ."); <u>see</u>

Belotz v. Jefferies & Co., 213 F.3d 625 (2d Cir. 2000) (summary order) ("[T]he doctrine of part performance is of no aid to appellant.  Section 5-701(a)(10) does not expressly provide a part performance exception, and the New York Court of Appeals has firmly stated that there is no such exception.").

A transaction did proceed with a different deal structure in which there was only one investor, HBJ.  But plaintiffs were not left out in the cold.  In a series of emails dated April 29-30, 2014, Alkholi and Halawani agreed with representatives of HBJ to accept the sum of $750,000 to "settle any amounts owing to them relating to the [Property], and they will make no further claim for placement or broker fees."  (Doc 42, Ex. P.)  Halawani, with copy to Alkholi, confirmed in an April 30 email that upon receipt of this payment, they would "have no further placement or brokerage fees related to the transaction."  (Id.)  There is no dispute that the sum was paid to them.  As noted, they were also later paid the sum of $5 million by HBJ for the lost opportunity to become investors in the Project. (Doc 41, Ex. A; Doc 46 ¶¶ 50-51; Doc 45 ¶¶ 40-41.)

The Court does not reach the question of whether any of the correspondence or documentation operates as a release of claims against MIP.  But the statements made by plaintiffs in the email exchanges of April 29 and 30 are inconsistent with a belief that they were still owed a placement fee by MIP.

Plaintiffs' reliance on later statements—after they had secured the agreement of HBJ and his related entities to pay them $750,000—that reflect their insistence that MIP still owed them the 2% placement fee is unavailing.  For example, plaintiffs submit correspondence from June 2014, when Halawani wrote to Kimmelman and Macklowe that "the settlement with HBJ and the 2pct placement fee are mutually exclusive."  (Doc 45, Ex. 5.)  Macklowe replied: "This was to have been part of your transaction with HE. Will follow up."  (Id., Ex. 6.) Halawani responded: "I beg to differ with you on getting our fees from HBJ. Dr. [Alkholi]

agreement with you was to be paid 2 pct placement fee from you directly as part of the transaction cost. As I explained in my email sent a week ago is that we are trying to negotiate with HBJ a settlement for excluding as co-investors in the transaction . . . . This has nothing to do with the 2 pct placement fee which I expect to be paid directly from [] you or the LPs."  (Id.) Halawani wrote to Macklowe again in October 2014: "Pursuant to our meeting in NYC with Dr. [Alkholi], I am writing to you to see when you are planning to settle the 2 pct placement fee outstanding issue."  (Doc 45, Ex. 8.)  Alkholi was also emailing Macklowe, demanding payment of the 2% fee.  (See, e.g., Doc 46, Exs. 9, 11-12.)  These self-serving statements were made after the April 2014 agreement that "they will make no further claim for placement or broker fees" with respect to the Project.  (Doc 42, Ex. P.)

   Considering the summary judgment evidence of both sides in its totality, no writing signed or unsigned reflects an agreement by MIP to pay from its own funds a placement fee to Alkholi and Halawani.  This omitted material term is the lynchpin of plaintiffs' oral contract claim.  Summary judgment will therefore be granted to defendant on plaintiffs' claim of enforceable oral agreement with MIP for MIP to pay plaintiffs a 2% placement fee.

 C. Unjust Enrichment and Quantum Meruit Claims

   Plaintiffs also allege claims of unjust enrichment and quantum meruit.  Courts applying New York law analyze these implied-in-law-contract theories together as a single quasi-contract claim.  Snyder v. Bronfman, 13 N.Y.3d 504, 508 (2009) ("Unjust enrichment and quantum meruit are, in this context, essentially identical claims, and both are claims under 'a contract implied . . . in law to pay reasonable compensation.'") (citation omitted); see also Mid-

Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005); Gutkowski v. Steinbrenner, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010).

Quantum meruit requires plaintiffs to show "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Mid-Hudson Catskill Rural Migrant Ministry, Inc., 418 F.3d at 175 (internal quotation marks and citation omitted). Similarly, in order to plead an unjust enrichment claim, plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 516 (2012) (internal quotation marks and citation omitted).

Subdivision 10 of N.Y. G.O.L. §5-701(a) states that "the provision," i.e., the requirement of a signed writing for certain contracts, "shall apply to a contract implied in fact or in law to pay reasonable compensation . . . ." Consistent with this statutory requirement, the New York Court of Appeals has allowed a quantum meruit claim to proceed where the writing "identifies the buyer, it identifies the defendant as one of the sellers, it establishes the fact of plaintiff's employment, it identifies the plaintiff as the broker, it establishes the subject matter of the transaction and, most important, it acknowledges performance by the plaintiff in bringing about the sale of defendant's stock." Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 576 (1969). The Court of Appeals concluded that the single missing term, the rate of compensation, could be implied in law as reasonable compensation. Id.

As then-District Judge Sotomayor noted, Morris Cohon does not place quantum meruit or quasi-contract claims beyond the reach of N.Y. G.O.L. § 5-701. "[C]ourts have

- 16 -

dismissed quantum meruit claims under the Statute of Frauds where the writings relied upon failed to establish that the defendant actually agreed to pay a finder's fee, or where the writings left ambiguity as to whether the agreement's terms covered the transaction upon which a fee was claimed." Springwell Corp.,16 F. Supp. 2d at 305-306 (collecting cases); see Morgenweck v. Vision Capital Advisors, LLC, 410 F. App'x 400, 402 n.1 (2d Cir. 2011) (summary order) (citing Grappo v. Alitalia Linee Aeree Italiane, S.p.A., 56 F.3d 427, 434 (2d Cir.1995)) ("It is well settled that under New York law a plaintiff may not escape the Statute of Frauds by attaching the label 'quantum meruit' or 'unjust enrichment' . . . to the underlying contract claim."). If the missing term cannot be implied in law or by implication from the surrounding writings, then the quasi-contract claim fails.

The November 6 email and the surrounding documentation do not permit an implied-in-law term that MIP itself, and not the contemplated joint venture or some other unspecified pool of investor money, was to pay the 2% placement fee. In fact, as discussed at length above, the subsequent December 20, 2013 email exchange and the draft term sheets indicate that it would be the joint venture, and not MIP, that would pay the placement fee. (See Doc 42, Exs. F, G; Doc 46, Ex. 8.) Thus, the unjust enrichment and quantum meruit claims fail. See Snyder, 13 N.Y.3d at 509-10 (upholding dismissal of unjust enrichment and quantum meruit claims on Statute of Frauds grounds despite allegation of years of effort to bring transaction to fruition).

CONCLUSION

New York's Statute of Frauds is intended to prevent claims for a finder's fee to be dependent on testimony which carries with it the perils of perjury and faulty recollection. Oral testimony may show the interconnectedness of writings, but may not supply a missing term. In a

sophisticated real estate development project of this type, it was reasonable for the identity of the obligor on any placement or finder's fee to be dependent on the structure of the deal. The missing term cannot be read into the writings on which plaintiffs rely.

For all of the reasons set forth above, defendant's motion for summary judgment is GRANTED. The Clerk is directed to terminate the motion (Doc 39) and enter judgment for the defendant.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 21, 2020